The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez, all persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit are admonished to give their attention for the Court is now sitting. God save the United States and this Honorable Court. Good afternoon. We're happy to have you with us. Not seen by you but with us here and she can see you and we can see you and you can see us but not our third colleague, Judge Rushing. So we're going to try to be mindful of the fact that she'll be wanting to ask questions and defer to her because we can't see when she's getting ready to do that. We're happy to hear argument in our first case number 20-1191 Wikimedia v. National Association of Good afternoon, Your Honors. May it please the Court. I'm Patrick Toomey representing Appellant Wikimedia Foundation. This appeal is about Congress's decision to authorize review of intrusive surveillance activities in the courts. We explain in our briefs why Wikimedia has put forward more than enough evidence to defeat summary judgment. Evidence on which a reasonable fact finder could rely to conclude is more likely than not that some of Wikimedia's upstream surveillance. These specific facts support Wikimedia's standing and defeat summary judgment. The question is what happens next. The government argues that the case still must be dismissed based on state secrets. But Wikimedia has put forward more than enough to trigger FISA's protections. So it's FISA's procedures that control here. That's the real heart of this appeal, Your Honors. The question of whether a plaintiff who comes into court with extensive public evidence of surveillance can obtain judicial review as Congress mandated in FISA. I'd like to begin there and then explain how this case should go forward using the in-camera review procedures that Congress enacted. In FISA, Congress authorized civil suits challenging unlawful surveillance and specified procedures for litigating those claims. Nonetheless, the government argues that it has the power to block this court review of FISA surveillance by asserting the state secrets privilege. Well, isn't essential to the government's argument its claim that 1806 F only gives the government, as he as it puts it, a shield. It doesn't give you a sword. You're right, Your Honor, that the government argues that 1806 F only applies in criminal suppression proceedings or similar proceedings. But other courts have repeatedly held that these procedures are available in civil cases like this one. That's what the Ninth Circuit held in FISAGA. The D.C. Circuit recognized it in the Barr case, and other district courts have found the same, including an in-ray NSA telecoms case. To be sure, but if you just look at the government protection, if you will. Can we agree on that? No, I'm afraid I don't agree with that, Your Honor. First of all, the text of 1806 F itself controls, and that the text of the third prong, which governs whenever an aggrieved person files a motion to discover or obtain FISA-related information, is broad and clear. And because that is not ambiguous, it controls here. And it covers circumstances where a plaintiff like Wikimedia has sought to discover FISA-related information in a civil case. Mr. Toomey, can you back up? You started with the text, but what about the title of the statute, which suggests, consistent with the government's view of things, that it only applies when there's some affirmative use of this information being used by the government and or some attempt by a motion to suppress or something like that? That at least seems to make sense based on the heading of the statute. Why isn't that persuasive or at least some indication of what Congress intended? Well, the heading of the section is use of information. It does not specify use of information by the government. And of course, the title doesn't control the meaning of, you know, in the extent that it's inconsistent with the words of the statute itself. Congress... I'm sorry, isn't there a federal law that the titles don't make any difference? There's only a state law. That's exactly what I'm saying. The title does not control the meaning of the text. And so to the extent the government's arguing that that determines the meaning of the statute, we disagree. But again, going to the text of 1806 F itself, Congress was clear when it enacted FISA that that provision controlled in both criminal and civil cases. And the statute does not contain any of the limitations that the government tries to read into that third scenario under 1806 F. If notice of surveillance was a precondition to parties using 1806 F, Congress could have stopped after the first prong in 1806 F, the prong that says when a person has received notice. This is the invisible Judge Rushing. Thank you. But one of the limits that's explicitly in the has defined as someone who is the target of an electronic surveillance or any other person whose communications or activities were subject to electronic surveillance. Why doesn't that limit the provisions, even if it doesn't create this solely government shield version of the statute, it at least limits it to individuals who, in fact, were surveilled and are attempting to litigate regarding that surveillance. So you're right, Judge Rushing, that 1801 K defines who is aggrieved, but it does not say what a party must show in order to be aggrieved and to utilize Section 82. And in the ordinary court of civil proceedings, a party is entitled to discovery after it overcomes a motion to dismiss and has put forward specific plausible allegations. And that is the natural reading of the statute here in civil cases where a plaintiff is challenging by surveillance. Hold on, Mr. Toomey. I think we may have lost Judge Mott. No, it's just my video went off. I can still hear you. So maybe I'll be able to hear you. Okay. Yeah. So go ahead. I'm going to try to get it back. Okay. Thank you. So as I was saying, the statute, either 1801 K defines what a plaintiff must show in order to be aggrieved. And what Congress was attempting to do in 1801 K was to make clear that an aggrieved person is someone who falls within the scope of the Fourth Amendment protection, a person who was targeted in crisis surveillance or who was otherwise subject to crisis surveillance. Now, I also want to say that the government's reading would require courts to essentially conduct a bifurcated mini trial on a person's aggrieved person's status in every civil case involving crisis surveillance. Because of what the implication of the government's argument is that a person should have to prove they are aggrieved before they're entitled to discovery. As Professor Vladek lays out in his amicus brief that is in the State of Chicago Court, the plaintiff makes a decision. That's inconsistent with how discovery typically occurs in a civil case. Or it could just be an indication that as the government suggests that the in-camera review proceedings have to do with determining the legality of surveillance that people know actually occurred rather than with determining whether, you know, affirming or denying whether it occurred. Well, the standing and the lawfulness inquiries are inherently intertwined in Fourth Amendment cases. The question of whether a person was prevailed and the question of how a person was prevailed are intertwined and often rely on review of the exact same material or overlapping materials. In these types of cases, it would be the FISA application and the intercept. And the other thing that I want to emphasize for the court is that the government's interpretation is at odds with the statute structure and the comprehensive scheme that Congress enacted. Because it would mean that the government could control who could avail themselves of the Section 1806 Act. And because it would mean that a person would have to litigate the question whether they were surveilled to prove. And in the course of that special proceeding, the government could assert the state secret privilege exactly the way that it's asserted here. And that would make American citizens' ability to take, to avail themselves of the remedy that Congress created completely contingent on whether the government had admitted the prevails. And Congress... But isn't that, Mr. Toomey, I mean, that's always the case when the government asserts the state secrets privilege. There may be a remedy that a plaintiff may be entitled to either in a civil or criminal case, but that remedy is foregone because of the higher interest of protecting the government secrets. That is true under the common law state secret privilege, Your Honor. But in the advice that Congress is clearly setting out to do something different. The structure of the statute and the legislative history makes it clear that Congress is seeking to balance civil liberties against national security and to create a set of procedures that allowed plaintiffs with substantial claims of illegal surveillance to obtain a ruling on the merit and where appropriate to obtain a remedy. And Congress... So with respect to that ruling on the merit, so you've made the point, I guess, that the caption or heading of the statute doesn't control. Let me see if the subheading might be more persuasive. So 1806G talks about the remedy that's allowed in these cases. And it And the government argues that this just doesn't make any sense, the argument you're making, because ultimately what the remedy is, is a grant or denial of a motion to suppress. So what's your response? I mean, that's not an adjudication of the merits, but simply a ruling consistent with the balance of the statute that really deals with the use, improper or otherwise, of information in a particular context. Well, 1806G, again, based on its text, is not limited to suppression. The text of 1806G says that a court can issue, can order suppression or other appropriate relief based on the party's degree for the motion. And that clearly encompasses relief other than suppression. So, again, we don't think that 1806G forecloses plaintiffs from using 1806F in the way that the Ninth Circuit has recognized in Pisaga, and in the way that the D.C. Circuit acknowledged was available in the Barr case. Now, I want to go back for a moment here, Your Honor, and touch on one of the big picture themes of this case, which is Wikimedia has put forward compelling evidence of surveillance. It has trillions of internet communications, web communications. The government has acknowledged that it conducts the surveillance on technology and Wikimedia's communications traverse all of those things. The government has acknowledged that it collects web activity, precisely the type of communications that Wikimedia engages in. And Wikimedia has put forward the expert declaration of Scott Bradner, and Scott Bradner's conclusions have been endorsed by nearly two dozen technologists in the amicably committed to this case. The government's theory, in order for the government to be right that Wikimedia lacks in is not agreed, the government would have to be filtering out every single one of Wikimedia's communications surveillance. And the government has not put forward a single piece of evidence that supports the existence of a Wikimedia. Well, they have an expert who says that they could filter out. That's right. They have an expert who says, in his view, it would be technically feasible. But the point I want to emphasize is that the government's argument is not really that if Wikimedia had more evidence, had more experts, it could satisfy the requirements of FISA and use those procedures. But the government's argument at the end of the day is that it has the power to decide who can proceed to obtain court review under FISA and who cannot. And our claim is that that is inconsistent with the statute structure, the statute, including the remedies that Congress created in the legislative history with which it acknowledges that the government may have to proceed, in some cases, in civil suits brought against it. And with Congress's overarching purpose in FISA, which was to rein in overreaching executive branch surveillance. Can we go back to Judge Rushing's question about the aggrieved person? And as I read your brief, you acknowledge that the standing and merits issues would have to be determined together. You say there's no problem. The government says they're always bifurcated, that that's the uniform practice. That's right. The government makes that claim, Your Honor. But as we point out in our brief, it's not true in the first place. There have been FISA cases where standing and the merits have been litigated at the same time, including the district court proceedings in the Clapper case itself. And second, there's nothing in the statute that requires courts to bifurcate. In fact- No, to be sure. Let me put it to you this way. In the Supreme Court, often the question is, well, how does the Supreme Court write? And so, if you came out of your way, what would you be saying to the district court? Don't bifurcate? That's a good question, Your Honor. I think the court could, we think the court should, the district court proceedings should go forward on both standing and the merits together. And we think that the court should suggest that the district court proceed in that way because it preserves the greatest flexibility for the district court in deciding how to rule down the line. If the court is ruling on standing and the merits, it has the option, if it wishes, in the way we describe in our brief, to issue a short ruling that does not just determine whether it has ruled on standing or the merits. I see my time's up. You can go on and my colleagues may have additional questions too. So, finish the answer to that question. Sure, I will. Thank you, Your Honor. And so, we do think that the case should move forward on both and that that preserves the greatest flexibility for the district court to take steps to ensure that it does not unnecessarily disclose any sensitive information. But one important point on that, Your Honor, is that the government makes obviously many arguments about what it claims is the potential for sensitive information to be disclosed. We, I want to emphasize that that issue is not relevant to the legal question before the court, which is whether FISA controls here. Congress made a judgment when it enacted FISA and that that judgment is binding. It balanced the risks of disclosure in the types of in-camera proceedings that it prescribed against what it saw were the benefits of ensuring that parties could obtain judicial review of far-reaching government surveillance activity. And go ahead, Judge Malatza. No, I was going to let my colleagues ask questions as they had them. I thought you'd answered the question. Judge Rushing, do you have any further questions? Yes. If that's all right, I'd like to... Oh, yes. I'll give it to them at the same amount of time. Thank you. I had a couple of questions on your establishing standing on these three of what we're calling the Wikimedia allegation. The district court on prong two relied on this statement by Director Coates about that international, on circuits carrying international internet communications. You don't, you mentioned that in your brief, but don't really rely on it. And I just wondered if you have a response to the defendant's argument that a circuit carrying international internet communications could be found domestically, that that term does not have to refer to international circuits found internationally, but could in fact be domestic because those circuits also carry international internet communications. Yes, Your Honor. A circuit carrying international communications could be domestic. But what we point to is the government's own disclosure in the FISC opinion, knowing that it conducts this surveillance at international internet links. Are you... Sorry. And you don't have to concede anything you don't want to, but I just want to make sure I understand. Are you agreeing with the government that the district court erred in relying on that statement by Director Coates for this to find prong two satisfied? I don't, we certainly don't agree the district court erred. We think that there is stronger evidence that supports Wikimedia's position and that, Your Honor, is the evidence we cite, the evidence about the surveillance happening at international internet links, because that is a more specific term. And that is the disclosure that Scott Bradner focuses on in addition to others in describing why Wikimedia's communications are subject to upstream surveillance as they international internet. And that's where you have a disagreement about whether that term is the same as the term circuits. And the district court concluded that that was a state secret. And you're not contesting that ruling that whether these two terms are equal is a state secret. You're just saying your expert can, without knowing the secret, your expert can determine from public evidence that in fact, those terms are the same. We are contesting that it's a state secret, Your Honor, and because the information is public. So because, and this may be where, where in your brief, you can test the district court's conclusion about the seven categories of state secrets. I saw a footnote kind of alluding to maybe that you have problems with one part of one of those categories, but I don't recall you contesting the conclusion that these seven categories were state secrets. Your Honor, we say at multiple points in our briefing, and we, there is, we say this in the text of the brief that to the extent that information is already publicly available in the government's own disclosures, it is not protected by the state secrets privilege. And that the categories that the district court described were therefore too broad to the extent that they covered information that the government itself had already made public. So where the, where the government's own disclosures, as in this instance, show that the surveillance occurs at international internet links, the district court is entitled to rely on expert testimony about what the meaning of international internet link is to a person who, a networking expert who is familiar with the meaning of those terms in the context of the internet backbone. Yeah. Can I, I don't want to keep this going on for too long, but I do have one more question if that's okay. On the, on the prong three, there's an amicus brief by the technologist that raises the idea that tier one, um, uh, what's the term here that the folks who are, uh, a tier one ISPs and encapsulate or wrap the headers. Um, so that what the government's claiming it does in terms of filtering based on header information would be impossible on those, um, with those ISPs. Um, I think that's an interesting, that's, that's, I'm interested to hear what the government has to say in response to that, but I wanted to ask you, um, whether any evidence about that was brought up in the district court. Um, I didn't find anything in the JA, but it's a big record and I wanted your help on looking to see whether this, um, header wrapping or encapsulating, um, was I don't know the answer to that off the top of my head, your honor. You're, you're quite right that, uh, there is an extensive expert record here. Uh, I, of course, I'm happy to try to find the answer to that for you. I will say that we have put forward in the record extensive evidence that the government is not engaging in filtering in the way that the government's expert hypothesizes. And if the government is not engaging in filtering, then, uh, it is necessarily copying and reviewing some of Wikimedia's communications and Wikimedia's evidence, of course, on the standards that control that summary judgment in this case, and every other case, uh, is entitled to be credited as true reasonable inferences are to be taken in Wikimedia's favor. And the district court failed to apply those standards properly in this case, which he has. Do you have any additional questions? Uh, I don't. Thank you. Thank you very much. Um, Devin, almost eight minutes. And so I will give the government eight minutes and let you reserve some time for rebuttal. Thank you, your honor. Good afternoon. And may it please the court Joe Busa on behalf of the discovery into highly classified facts regarding the location subjects and methods of NSA's upstream surveillance. Those matters are state secrets whose disclosure would cause quote, exceptionally grave damage to national security. And we urge the court to review the classified declaration to that effect. Now those privileged matters are absolutely privileged under this privilege. They can't be used by the government or by plaintiff or by a district court sitting in camera. The district court also correctly granted summary judgment to the government because that privileged information will be so central to the case that any attempts to proceed will threaten that information's disclosure. That includes in camera use of that information was antithetical to the core principles of the privilege. And there's a lot to address in this but I think it's most important to start where the court spent most of its time with my colleague on the other side. And that's the contention that obscure provision of the FISA applies here and displaces the privilege, but it does no such thing. And I think it's important to start just by looking at 1806 as a whole to read statute as a whole in order to understand what it's doing. And I'll start with the title of the statute. The Yates case actually makes clear that the title of the statute is not relevant to the interpretation of the substantive provisions within the statute. And the title is use of information. Now whose use is it? It's the government's use as illustrated by all of the subsequent provisions of that statute. A says that the government's use of that information is subject to minimization procedures. B says that the government's use of that information can only be done with the attorney general's permission. C says that the government to provide notice. D says the same thing about a state government's use of that information. E says that when we're using information against somebody in litigation, that person can seek to suppress that use based on the allegation, based on allegations of unlawfulness. Now taking that as background, it's clear what the procedures in F are for. Therefore resolving those specific issues, the government's ability to use the information or not by application of in-camera procedures if we invoke them. That's why the statute says if the attorney general invokes them. Doesn't say the attorney general shall invoke them whenever some plaintiff wants to make us. And the key issue here, as the court was focusing on during this time with my colleague, is that the decision inside an F procedure regards the legality of surveillance to use that as the rule of decision about granting or denying the motion that brought the entry into the F procedures. It has nothing to do with- Mr. Dusek, can I add to the essay? I'm sorry to interrupt. Of course. So with respect to 1806 F, I'm interested in, I think, obviously interested in that third subset of that section, which you've sort of touched on here generally. But in your brief at page 18, you said, and I'll just quote it here, that that circumstance, little I-3, is not a free-floating right to discovery. And then you say that's rather it's a description of a situation in which certain motions made pursuant to some other provision of law may be removed by the government from adversarial adjudication in open court and submitted for camera determination. But then you stop and move on to something else and you don't give us any examples of what it is that you're talking about. So I'm trying to figure out exactly what that means. And can you give us an example of what you mean? Yes, Your Honor. An example would be a discovery motion seeking to discover information in order to challenge the government's ability to use it, to figure out if the information the government is using is the result of electronic surveillance, or to figure out the scope of what ought to be suppressed based on a taint theory flowing from unlawful surveillance. So it's a discovery motion that is attendant to the government's use of that information. That's consistent with what all of 1806 is all about, what the prior two prongs of 1806 F are about, and it's what the statutory text other means in this third prong. It's not talking about any motion to obtain or discover information. It's talking about any other motion to obtain or discover, in contradistinction to linking to the prior two circumstances, the chief one being that motion to suppress under E, which is what's referred to in the second clause. This is just like what the Supreme Court confronted in the Biguet decision, where it confronted language that referred to a crime of arson, burglary, murder, or any other crime with a substantial likelihood of personal injury to a person, I believe is the language. And the Supreme Court said you don't just look in isolation at whether a crime might have a substantial risk of injury. The word other there is telling you you link it back to the prior elements in the list, and you figure out whether it's similar to those other prior elements. That's also what's going on here. So we think that's from the context of the statute, the fact that the resolution of the motion depends on the legality of surveillance, which is true when you're talking about surveillance or a motion for discovery related to taint or an attempt to suppress, but is wholly untrue. That's not the rule of decision when you just have a free floating discovery motion. No one says, not even plaintiff, that you could grant or deny their motion to compel discovery based on the determination of the language of the statute, either in F or in G. I was going to ask you about G. So I guess your answer to the question I asked your colleague on the other side regarding the remedies in G when he opined that the remedies are much broader than a simple grant or denial of a suppression motion, and he pointed to language in that subsection that talked about granting or denying a motion to suppress or similar motion that we're talking about the same categories of motions that you just described that limit the application of F. Is that fair? That's exactly right, your honor. And the key point analytically is it doesn't say grant final judgment on an underlying civil claim. So you actually can't use 1806 F to do that. So plaintiff's entire theory that you could claim text of F for that simple reason, and then... I'm sorry, Judge Mons. Yeah, can I ask you how your reading of 1806 F, or the whole statute actually, accommodates the cause of action given in 1810? I'd be happy to, your honor. So the cause of action in 1810 is linked to criminal liability in 1809, and the conference report, that's house report 95-1720 at 34, I want to say, or maybe it's 32, says that the scope of civil liability should, quote, coincide with criminal liability under 1809. So it's clear that 1810 isn't going to be some omnibus statute that basically anyone can use to allege and challenge surveillance, and so the core application of 1810... I don't understand how anybody could use it, given your interpretation of 1806. I mean, in other words, the government can do away with any claim, according to you. So I don't think that's quite right, your honor, and I just wanted to illustrate sort of why that is. The district court got it right when it said, look, 1810 actually doesn't apply against the government at all, as the Ninth Circuit is squarely held. It only applies to these sort of rogue intelligence agents in their... in suit in their individual capacities, and there's no reason to think that if the government were to, say, criminally prosecute an intelligence agent who were surveilling somebody without FISC authorization, that that then wouldn't allow some kind of follow-on civil suit. No, but the other key point is that 1810 is not a promise that every litigant who tries to bring that claim will end up being able to obtain final judgment on the merits. There may be a whole host of... You're making the distinction between civil and criminal cases, which, you know, which is a happy one for you, except doesn't 1806 also refer to criminal case... to civil cases? Yes, and we've never claimed otherwise, your honor. So, for example, the Hamid case... No, I actually don't think it turns on whether we initiated the lawsuit or not. It actually turns on whether we're trying to use... whoever initiated it, whether it's civil or criminal, if we're trying to use information affirmatively against the person we're litigating against, that's when 1806 comes into play to determine whether we're able to do so or not. I just want to actually return to the discussion about whether, you know, this is entirely within our control and whether plaintiffs will be able to bring civil lawsuits challenging alleged NSA surveillance. So, just to finish that argument, because I think it's very important. First, when we give notice in criminally prosecuting somebody, we are telling them you were subject to surveillance. Now, if then there's a determination that surveillance was unlawful for some reason, there may be an opportunity for that criminal defendant to turn around and become a civil plaintiff and then see... But, sir, we know from history that sometimes you don't give notice and there is surveillance. We have confessions by the attorney general. There's a number of instances in this case that are talked about, correct? So, we absolutely have... Do you want me to go find them in the brief? You don't remember those? No, no, your honor. I'm not denying that there has been dispute about whether the government is giving... Attorney General of the United States confessed error. Yes, your honor. And since then, the government has redoubled its efforts. Well, I'm glad to hear that. But still, that was a dispute. That was a withholding by the government that it was not permitted to do, right? I believe that was the basis for the confession of error, your honor. But to return to the answer, we have provided notice in these cases and that's why the Ninth Circuit and the Second Circuit have addressed and upheld the constitutionality of a different type of FISA 702 surveillance, the PRISM program, in cases we cite in our briefs. But then to move on with the answer, there's the ACLU versus Clapper case in the Second Circuit, in which we actually didn't invoke the state secrets privilege when the plaintiffs there sought to challenge NSA's call detail record collection. And standing did not prove to be an obstacle, ultimately, in that case. We didn't invoke the privilege. And so, it's simply not true that everywhere and always, we're going to invoke the state secrets privilege. That's because the privilege is not likely invoked. We follow the Supreme Court's mandate in Reynolds that we think hard about it and use it only where necessary. Secondly, it's not a tool wholly within our arsenal. The district court stands as a gatekeeper and it reviews our invocation and either upholds it or does not. It was upheld here properly and for very good reason, as the Barnes Declaration makes the classified declaration here. And finally, the privilege is not a categorical matter in the way the plaintiffs imagine. It's simply not true that everywhere and always, in suits like these, there will be a fundamental state secrets problem. There wasn't in ACLU versus Clapper, the Second Circuit case, we were just talking about. We didn't even invoke the privilege. Excuse me. May I ask a procedural question? So, you've mentioned twice the classified declaration of the deputy director of the NSA, I think it was, who filed that declaration and Judge Ellis relied on it. I was just curious. So, it would seem to, given the invocation of the state secrets privilege, it would seem to almost waive it if, in fact, you've submitted something in camera for the court to review. So, can you talk about, I mean, what was the process for that? So, this is actually the traditional process followed in state secrets cases. It's very common for the government to submit a public declaration saying these categories of information are privileged because disclosure would harm the national security. And sometimes a public declaration might suffice on its own. But very frequently, we will have to follow that up with an in-camera classified declaration explaining and laying out exactly why release of this information would harm the national security in grave ways by, you know, I can't go into the details here, obviously, but the general... Right, right. But my question is, isn't that the equivalent of the in-camera review that we're fighting about with respect to 1806, or is it something different? It's something different, Your Honor. And so, this court's necessary to examine some information in camera to determine if the category of information is privileged. But once you make that determination, the privileged information is removed from the case entirely, and there can't be further in-camera proceedings using the privileged information to conduct the litigation. That's antithetical to all the principles of the state secrets privilege. I think Elmas and Sterling are quite clear on that point. Well, of course, their fundamental claim with the meaning of that is that the state secret privilege is no longer official. And I know that you don't agree with that, but if that is so, the court, in the case of the privileged issue, has agreed with the privileged information. Judge Motz, I don't know about you, I don't know about the lawyers, but I had a hard time hearing what you were asking. Oh, I'm sorry. My thing is on as loud as it'll go. Can you hear me now? It's fine now. Yes. Okay. I'll just try to talk louder. I don't usually have a problem. No, it wasn't that you weren't loud enough, it was just muffled for some reason. But you're fine now. Okay. What I was asking you is about the claim by Wikimedia that 1806 does away with the privilege. And the fact that other courts have considered this, a number of other courts, maybe all, every other court has considered this exact argument, has agreed with Wikimedia. Your Honor, the only other circuit court I'm aware of that even has this argument. Sorry, Your Honor. I said every other court. Oh, I'm sorry. There was some audio problem. So I apologize. No, so I just want to highlight this style of argument that Wikimedia has been raising here has only lately arisen, right? This is sort of a late-breaking discovery inside the FISA, starting decades after the FISA was enacted. So there's actually that much case. I saw that in your brief. But actually, there seem to be cases that are 10 or 20 years old. So I don't know that that's been true. But go ahead. No, so I agree. Even taking the cases that the other side cites too, I think they start in 2004, 2005. My simple point is, there's not too many cases on this subject. Many of those cases they cite too, my reading of them was that the court took it as a hypothetically could be true that you could use 1806 in this but did not use that as a basis for resolving the claims before the court in those opinions. So I would take many of those as being dicta. In any event, I really want to address this head on because I think it's very important. Nothing in 1806 F indicates that it intends to displace the state secret's privilege. First of all, El-Masri makes clear that the privilege has foundations both in the common law and the Constitution. El-Masri said it has to- El-Masri was decided, I was there when it was decided, maybe I was on the panel, I remember it very well. The Supreme Court has said that this is a common law privilege. And that's the law of the Supreme Court, right? Oh no, so I don't- the Supreme Court in general dynamics did not have an occasion to determine whether in addition to being a common law privilege, it also has constitutional foundations. Well, it's characterized as a common law privilege if it was a constitutional privilege, don't you think they would have said that? No, Your Honor, there's nothing- these two buckets aren't mutually- they can coexist together. So I think it's actually quite commonplace to talk about the common law when figuring out the scope of a constitutional right or obligation. We talk about that in the Fourth Amendment context quite frequently. And so there's actually nothing sort of odd about the idea that a part of the common law is also constitutionalized. And so we think El-Masri has that just right. But also the Supreme Court in general dynamics did not turn around and say, you know, and call into question what it previously said in Egan and Nixon. In Egan, it says that the Article 2 obligations of the executive branch to protect classified national security information, that that's a constitutional function of the government. And Nixon says that privileges that help the executive carry out its constitutional obligations are themselves part of the executive privilege and have a constitutional basis. That's why El-Masri was right. General dynamics says nothing to call it into question. And just to highlight, there's nothing antagonistic about saying that 1806 F procedures can coexist with the privilege. Indeed, as we point out in our brief, the D.C. Circuit noted in the Belfield case that even before 1806 F was enacted, the government's ability to use information obtained and derived from electronic surveillance was often subject to a determination in camera and ex parte. And that coexisted comfortably with the existence of the state secrets privilege because they have different scopes and different functions are invoked by different people and they do different things. 1806 F is about whether we can use information against another litigant. That's why it's invoked by the attorney general. That's the decision maker in charge of government litigation. The state secrets privilege is about removing information from a case. So it can't be used by us or anyone else, including the district court in camera. And it's that's invoked by the person with control over the information. And it's different. So that seems a little bit inconsistent, excuse me, a little bit inconsistent with the plain language of the F, which includes among its, you know, the things that a party can do includes discovery of certain information. So how does discovery of information square with removal of information pursuant to the privilege? Because again, that's the F procedure is where we're trying to use information against another litigant. And that person is trying to- Well, the government would have no need to discover information. It's got the information. So the suggestion to discover information must mean something. It must mean that the other side, the person who doesn't have the information is seeking to obtain it in some way. Correct, your honor. And as we were discussing earlier, our view is that the best reading of that language is as a discovery motion that's seeking to do something similar to what the suppression motion in E is seeking to do. So here it would be discovery related to the question of, taint from a prior unlawful surveillance, right? So the question of what scope of evidence has to be suppressed. So that's the kind of discovery motion we're talking about, something tied to the government's use of information. That's why- Is there a case, do you have a case that stands for that proposition or would this be the first case? I'm not immediately aware of a case addressing that question other than, of course, the Fazaga case we've discussed before in the Ninth Circuit. And I think that's because it's so rare for litigants to try to make use of this third clause because the third clause, as the legislative history makes clear, is there in order to prohibit, quote, inventive litigants like the plaintiff here from trying to bypass the procedures laid out in the prior clauses. That's the first and second clause. And so to my knowledge, there's not much litigation about what can fit within this third clause. We think all the textual indications are in our favor here. There's the title of the section. There's the fact that all the prior sections about the government's use of information, the first two clauses of 1806F are about the government's use of information. Here it says other. It's not any motion to obtain or discover. It's any other motion that links it back to the essential features of the prior thing. And it's also what gets determined in the 1806F procedures. That's legality of surveillance. That's the rule of decision for deciding suppression and discovery attendant to suppression. It can loop that question. But it's not the rule of decision for a general discovery motion like what plaintiff has presented here. And the plain text of G and F is that the result of an F proceeding is not, you know, final judgment on the merits of a civil case. It's the grant or denial of a motion, right? So, and I think it's actually important to address something that arose in my colleague's stand-up time that I want to make sure I have a chance to address before my time is out, although I see I'm running down. So, if I might have a chance to address this idea of a general verdict, maybe protecting state secrets, and it's clearly impossible in this case. First, we just went over how 1806F can't be used for adjudication to final judgment on the merits of civil claims. It just doesn't fit with a plain text of the nor could you use the state secrets privilege, because we know from Sterling and El Mastri, you can't use privilege information, ex parte, and in camera. But secondly, a bottom line ruling, quote, plaintiff wins, as plaintiff here imagines, would disclose standing, and that would reveal state secrets. Secondly, because they can't get past... No, no, that's not necessarily... Sir, I don't think that's necessarily... I thought about that. I don't think that's necessarily so, unless you're talking about revealing it to the district court, which seems to me that your whole argument seems to be... Judge Motz, you're muffled again. You're muffled again. I'm sorry. Talking the same way. You'll just get... I'm afraid if I get too close, I'll be nauseous. But anyway... No, you're fine. You're fine. Go ahead. Anyway, I'm afraid I've lost my train of thought. But the district court isn't revealing... Do you believe that revealing things to the district court breaks the state secret? And that seems to be what you're saying. I have two responses. I'm sorry. I have two responses, Your Honor. The first is, yes, that's exactly what Sterling says. Sterling says the risk of using state disclosure outside of chambers. Well, I don't know that that's exactly... Yes, to my question. I understand that that's a risk. But so it's the government's position here that revealing information to the district court to consider all by itself, and then to issue an appeal that may put under seal the whole thing, that that is revealing a state secret. So first of all, again, two responses. And to get the second one, yes, the district court... What is the answer to that question? So yes is the answer. That would violate the state secret's privilege. El-Masri and Sterling make clear you can't use privileged information in camera and ex parte because that's playing with fire, in the words of Sterling. It risks, inevitably, that unintentional disclosure outside of chambers. And that is too great a risk to allow. That's why this court's precedents and Supreme Court don't allow use of privileged information to decide the merits of any case. That's been roundly rejected. But also just to highlight why even if it were thought you could go through with that kind of in-camera procedure consistent with the state secret's privilege, even the bottom line ruling, plaintiff wins, that would necessarily disclose standing. And as the district court correctly found, the existence or nonexistence of surveillance of entity like the plaintiff here is itself a state secret that would give a roadmap to foreign adversaries, very savvy foreign adversaries who know how to read the tea leaves, as to which channels of communication are open, which are not. It would allow them to evade lawful government surveillance. It would also give them a roadmap for conducting operations against the United States. Those are all extremely grave consequences. They're discussed in detail in the classified Barnes declaration. And so that simple reason, even the bottom line ruling, plaintiff wins, would disclose the state secret. And of course, if plaintiff can't win, then it's got a remediability problem from the get-go in terms of standing. Can I ask one question about a grieved status, a grieved person? Can you become an aggrieved person under this statute in any other way than the government's submission? I think it would be quite difficult, and I can't think of a concrete circumstance where they'd be able to do that consistent with the privilege. But I think my answer about that, it's really impossible to state in categorical terms, because again, the question for the privilege is whether revelation of the underlying information would pose such a harm to national security, that that information has to be removed from the case entirely. And that's a question that just going to depend on the context of the case. My best pitch for you on this is just to think about ACLU versus Clapper. That's that Second Circuit 2015 case in which we did not raise the privilege. And the plaintiff there, my understanding was, was able to make outstanding on the basis of a public record. And so it's simply not the truth. This is a tool wholly within our toolkit. And in any event, the district court is ultimately the one that decides whether the privilege is or not. And so it's not true that the civil plaintiff is at our mercy. You have about a minute and 30 seconds left, and I want to give my colleagues a chance. Go ahead. I'd like to ask you, Mr. Busa, what I asked Mr. Toomey about, about the feasibility of inline filtering. As I mentioned, the technologist brief raises something that I didn't see either side discussing about the fact that these Tier 1 ISPs wrap or encapsulate the header. And your argument for the feasibility of inline filtering seems to rely on access to the header. What's your response to that? My two responses, one on the merits, which is that they seem to be wrong. But secondly, they don't actually, it's important that that is not an opinion from an expert offered on the record in the district court and subject to adversarial testing under 702. And so we think it's quite unfair for plaintiffs to try to be relying now on the untested assertions and sweeping conclusions drawn here without any of the underlying evidence that an expert would need to show they're relying on in order for their opinion to be admissible as evidence, right? So I can't point you to, I'm sorry, your honor. No, I was just going to clarify. So you don't think that this was raised or any evidence about this was brought in front of the district court to create a fact question there? No, your honor. And certainly not in the sweeping terms that amici presented. I think it's very telling that the reply brief quotes the amici and their very sweeping conclusions. And then just says, see also some paragraphs of the Bradner declaration where when I read them, I don't read Mr. Bradner reaching any kind of those kinds of sweeping conclusions that amici seem to raise. And so we do think it's quite unfair for plaintiffs to be trying to inject that into the record now, when it's clearly not part of the record. Secondly, just to address the merits of all of this, even amici don't say that all tier one ISPs do this encapsulation. So it really is a question of wherever the government is conducting surveillance, wherever that may be, is it able to do so in the method laid out as a hypothetical by our expert? The answer even under the amici's reading is yes, if that's being conducted at a person who's not using this encapsulation technique. And secondly, even addressing this encapsulation point, you know, just reading a Wikipedia article about encapsulation, ironically, it seems to me that on the merits, encapsulation happens within a certain part of a network. And there's routers that pop on and off these capsules, and there's other routers in the middle that just read the capsule heading. And so even on... We're the expert now. No, and that's the problem, Your Honor, is that we never had a chance. Sir, let me let my colleagues ask any additional questions. You've already gotten another three minutes. Okay, Judge Rushing, do you have any more questions? No, thank you very much. What did you say? I said no, thank you, Judge Watts. Okay, Judge Diaz? I don't, thank you. All right, perhaps you can conclude your argument in five seconds. We simply ask that you affirm, Your Honor. Thank you. Thank you very much. So, Mr. Toomey, I'll give you three additional minutes on top of what happened because your colleague got three additional minutes on top of what I've given him. Okay, thank you. Thank you, Judge Watts. Appreciate it. Just quickly to touch on the point that Judge Rushing raised, the expert declaration does address techniques similar to the encapsulation that is discussed in the amicus brief, and that's in the first Bradner declaration at paragraphs 91, 174, and 230, which discuss the use of tunnels and gnats by providers, and those techniques wrap communications in another layer in the same way that the amicus brief. Is that about the, is that about the header? Because that's what, I mean, the government is saying it can filter based on the information in the header. Yes, Your Honor. Yes, it is. Are those the paragraphs that you cited in your reply brief? I don't know that we cited those paragraphs specifically in our reply brief, Your Honor. I did want to point out that those issues were addressed in the declarations in the record. So, you're saying it's the same thing as tunneling or similar enough that you put the district court on notice and that the government should have had its expert respond to that? Yes, Your Honor. Tunneling and gnats, N-A-T-s, is the other technique. But what I want to come back to some of the bigger picture questions. First, the government claims that one can find a limitation in 1806 F by pointing to two of the scenarios in the statute as showing that there must be clear evidence or a government admission of surveillance. But even the second prong under 1806 F, which discusses when a defendant may bring a motion to suppress, does not depend on government notice. A party is aggrieved regardless of whether a defendant has received notice or a person has received notice. And so, the pattern or the principle that the government is trying to draw isn't found there. The government's reliance on the word other in the statute, the government moves the word other to a place in the statute where it doesn't exist. What the third prong of 1806 F refers to is other statutes or rules. And there's no ambiguity about what that means. Other statutes and rules means other than the provisions in FISA that are the subject of the preceding prongs. On the question of displacement, the statute, again, speaks clearly. It says not withstanding any other law. And that encompasses the common law state secrets privilege. Now, I also want to emphasize that Congress clearly intended to encompass civil cases under 1806 F. And it did not draw the type of distinction anywhere that the government claims here. It did not claim that it only applies to civil cases where suppression or admissibility is at issue. And in fact, the House report at 95, I think it's 1253, page 94, talks about the government facing a choice of having to concede litigation when a suit is brought against it. And having to face the choice of whether to concede that civil litigation or not. So all of these show that Congress's intent and the structure of the statute, including the civil remedy judgments that you were asking about, fall within the scope of the procedure in 1806 F. And Congress was explicit when the conference committee met and the House and Senate versions of FISA were reconciled that this provision, the third prong in 1806 F, was being added to cover civil cases where FISA surveillance was challenged. On one further point in terms of what a ruling in Wikimedia's favor would disclose, the government claims it would provide a roadmap to people, to the public. But all it would reveal is that the government's public disclosures establish Wikimedia's standing, which of course the members of the public can already examine. Scott Bradner has examined them. The other experts who filed their amicus brief have examined those disclosures and have reached the unsurprising conclusion that Wikimedia, which engages in trillions of web communications, is subject to upstream surveillance, which the government has acknowledged includes collection of web activity. Now, a ruling for Wikimedia merely finding that it has shown it is more likely than not that some of its communications are subject to the surveillance, which is all that a ruling in Wikimedia's favor would show, would not add anything to the public record that any member of the public could not already see there. Thank you very much. We appreciate both arguments and your excellent briefs, and we'll take the case under advisement.
judges: Diana Gribbon Motz, Albert Diaz, Allison J. Rushing